**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALLAN GERHART,
                 *Plaintiff-Appellant,*

v.

LAKE COUNTY MONTANA; LAKE
COUNTY COMMISSIONERS MIKE
HUTCHIN, PADDY TRUSLER, and
CHUCK WHITSON, in their
individual and official capacities,
                 *Defendants-Appellees.*

No. 10-35183

D.C. No.
9:09-cv-00008-JCL

OPINION

Appeal from the United States District Court
for the District of Montana
Jeremiah C. Lynch, Magistrate Judge, Presiding

Argued and Submitted
December 10, 2010—Seattle, Washington

Filed March 18, 2011

Before: Robert R. Beezer, Diarmuid F. O'Scannlain, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez

## COUNSEL

Bruce A. Fredrickson (argued) and Angela M. LeDuc, Kalvig & LeDuc, PC, Kalispell, Montana, for plaintiff-appellant Allan Gerhart.

Dee Ann Cooney (argued), Cooney Law Firm, Helena, Montana, and Michael William Sehestedt, MACo Legal Services, Helena, Montana, for defendants-appellees Lake County, Montana, Mike Hutchin, Paddy Trusler, and Chuck Whitson.

## OPINION

PAEZ, Circuit Judge:

Plaintiff-appellant Allan Gerhart is a property owner and resident of Lake County, Montana. In 2007, Gerhart built an

approach to Juniper Shores Lane, a county road that borders his property. Around the time Gerhart constructed his approach, he was informed by a County employee that the County requires permits for road approaches. Gerhart filed an approach permit application, which was denied by the County Commissioners. This denial was remarkable because, according to Gerhart's undisputed testimony, at least ten other property owners on his block previously built un-permitted approaches to Juniper Shores Lane, all without consequence. Moreover, the deposition testimony of the County Commissioners indicated that outright denial of an approach permit application was rare, if not unprecedented.

After the Commissioners denied Gerhart's permit application, he brought suit under 42 U.S.C. § 1983, alleging that the County and the individual Commissioners violated his due process and equal protection rights. The district court granted summary judgment to Defendants after concluding that Gerhart could not establish a constitutional violation.

We affirm the district court's grant of summary judgment to the County. We also affirm the district court's grant of summary judgment to the individual Commissioners on Gerhart's due process claims, but reverse the district court's grant of summary judgment to the individual Commissioners on Gerhart's equal protection claim. As to that claim, we conclude that on the basis of the summary judgment record, a reasonable trier of fact could find that the Commissioners violated Gerhart's equal protection rights and that the Commissioners are not entitled to qualified immunity.

## I.   BACKGROUND

The facts presented in this section are culled from the deposition testimony of Gerhart; the three Lake County Commissioners who denied Gerhart's permit application; Larry Ehle, the Road Superintendent of the County; Kurt Moser, an attor-

ney for the County; and Terrance Murphy, a sanitarian for the County.

## A. Gerhart's Approach Permit Application

Around 1996, Gerhart purchased lakefront property in the Juniper Shores subdivision in Lake County, Montana. Gerhart's property is bordered by Juniper Shores Lane on the northwest. In late 1999, Gerhart began building a house on his property. Gerhart's "legal access" to the property is a platted community lane that does not actually reach Gerhart's house. To gain access to his building site, Gerhart initially obtained an easement from his neighbors, the Daues, in 1999. Gerhart, however, alleges that this easement eventually became unsuitable because it was often blocked by equipment for the Daues' construction projects. After multiple instances of being unable to use the easement, Gerhart built his own access road and approach[1] that stretches from his house to Juniper Shores Lane. Gerhart testified that, as a contractor, he was able to construct the access road around the drainfield[2] on his property. It is undisputed that having reliable access to

---

[1]The term "approach" is not defined in the County's permit application, nor was it defined by the parties in their briefing. The context in which the term is used in the materials for this case suggests that it refers to the portion of a road or driveway that abuts a road and is contained on the public right-of-way. We also note that MONT. ADMIN. R. 18.5.103 similarly defines "approach" as "that section of the highway right-of-way between the outside edge of shoulder and the right-of-way line which is designed as a highway for the movement of vehicles between the highway and the abutting property."

[2]The term "drainfield" is not defined in the Lake County Wastewater Treatment System Regulations, nor is it defined in Webster's dictionary. The Montana Supreme Court has explained that when "sewage disposal needs of the community are met by the use of individually owned and constructed drainage systems," the liquid sewage waste is "piped into underground drainfields and treated by a 'leaching' process where [the liquid waste] pass[es] through the soil surrounding the drain field." *Lincoln/Lewis & Clark Cnty. Sewer Dist. v. Bossing*, 696 P.2d 989, 990 (Mont. 1985).

Gerhart's house would increase the property's value by several hundred thousand dollars.

Unrelatedly, at some point around 2005, Gerhart was involved in a "neighborhood feud" with the Gobles, who owned property a few lots away from Gerhart on Juniper Shores Lane. According to Terrance Murphy, a sanitarian for the County, the Gobles (and others) complained to him that Gerhart had covered the drainfield with his access road.

A few days after finishing the access road and approach, Gerhart was contacted by Larry Ehle, the Road Superintendent of the County. Ehle told Gerhart that the County requires a permit for building an approach to a county road, a fact then unknown to Gerhart. Ehle also revealed that one of the Gobles had made the complaint that prompted Ehle to request a permit from Gerhart. Gerhart promptly filled out and returned the permit application. Gerhart also discovered that none of his neighbors in the Juniper Shores subdivision had received permits for their approaches. Gerhart alleges that since 1994 (the year the County began requiring approach permits), at least ten other lots on his block have constructed approaches to Juniper Shores Lane without a permit.

Gerhart testified that a few days after submitting his permit application, he received a phone message from Ehle saying, "I see the approach. It looks good. In fact, it looks better than any other approach on Juniper Shores Lane." Gerhart understood this message to mean that his permit application had been approved. Ehle did not tell Gerhart that the permit also had to be approved by the Commissioners, although the application form included blank spaces for the Commissioners' signatures. Nor did Ehle instruct Gerhart to stop construction on the approach.

Shortly after viewing Gerhart's approach, Ehle signed Gerhart's application and forwarded it to County Commissioners Mike Hutchins, Paddy Trusler, and Chuck Whitson for

approval. Ehle's signature indicated his approval of Gerhart's approach.

A few months later, in late 2007 or early 2008, Commissioner Trusler instructed Ehle that Gerhart's permit application was to be put on hold. Ehle testified at his deposition that he was surprised by this instruction, stating, "it raises the eyebrow and you kind of wonder what . . . is going on there . . . . That seemed to be a little out of the usual to me." Commissioners Hutchin and Whitson both testified that they did not remember why Gerhart's permit application was put on hold.[3] Only Commissioner Trusler testified about the purported reasons for placing Gerhart's application on hold. Specifically, Commissioner Trusler stated that the Commissioners had concerns about (1) the steepness of Gerhart's approach, and (2) the fact that Gerhart had constructed his approach without first obtaining a permit. Commissioner Trusler also testified that "there was a strong belief that the road that was already there crossed the drainfield." According to Commissioner Trusler, his concerns about Gerhart's drainfield were based on his personal knowledge of the Juniper Shores area and its topography.[4] Although Commissioner Trusler testified that he had

---

[3]In his deposition, Commissioner Whitson testified as follows:

Q (Babington): The commissioners took a different view [from Ehle]. And what I'm trying to find [out] is why did they take a different view than what Mr. Ehle recommended to the commissioners

A (Whitson): You know, I can't answer that. I don't remember.

Similarly, Commissioner Hutchin testified:

Q (Babington): And Mr. Ehle testified that he was told to put [Gerhart's application] on hold.

A (Hutchin): May have been, I don't know.

Q: Why?

A: I don't know.

[4]Before becoming a Commissioner, Trusler had previously worked for 22 years as Director of Lake County Land Services, which oversees the County's planning, sanitation, and solid waste disposal operations.

concerns about Gerhart's drainfield from the beginning, neither of the other Commissioners nor Ehle remembers Commissioner Trusler voicing these concerns until several months later, *after* the Commissioners decided to deny Gerhart's application.

In May 2008, the Commissioners, Ehle, and Deputy County Attorney Kurt Moser met to discuss Gerhart's application, and decided that Ehle would send a letter to Gerhart stating that the permit was denied. Roughly one month later, Gerhart received the letter, which did not contain any explanation for the denial. Around the same time, Moser and Murphy (the County sanitarian who responded to the Gobles' complaints about Gerhart's drainfield) exchanged emails about whether Gerhart's private road might cross his drainfield. In an email, Moser told Murphy that he spoke with one of the Gobles about Gerhart's drainfield and asked if the Lake County Environmental Health Department had taken any action against Gerhart. The next day Murphy responded to Moser,

> If the [C]ounty has other issues then lets [sic] team up and make it worth our while. I have a long history with Mr. Gerhart; to say that he is smooth (to the point of being slimy) is an understatement. Believe nothing that comes out of his mouth. If we take him on it will be quite an ordeal and burn up a lot of time.

Moser then asked Murphy to "put together a report with a list of facts detailing [Gerhart's] specific violations (Including how you know what you know)." Moser also suggested to Murphy that "[i]f [Gerhart] fails to remove the encroachment . . . then it would make sense to file everything at the same time." Gerhart confirmed that his previous interactions with Murphy had been unfriendly, and that Murphy had made it difficult for him to work in the County. Besides his history

with Murphy, Gerhart also testified that he had difficulty in dealing with other County planning and sanitation employees.[5]

## B.   Lake County's Approach Permitting Process

Lake County does not have a formal process for a property owner who, like Gerhart, wishes to construct an approach to a county road. In 1994, the Commissioners began requiring approach permits. As Gerhart points out, "[t]here are no written or documented rules, regulations, laws, or ordinances that exist in Lake County or in Montana that put property owners on notice that the [County's permit process] exists. The only tangible evidence of the County's Permit process is the Permit application document itself." Furthermore, the County often turns a blind eye to a property owner who builds an approach without a permit.[6] An affidavit in support of Gerhart's position states that most property owners on Juniper Shores Lane have added approaches to the road, all without submitting permit applications to the County.

Nor is there any documented process or guidance for the Commissioners to follow in deciding whether to grant an approach permit once an application is submitted. Still, the

---

[5]As just one example among many, Gerhart testified that he had a project that was previously stalled by County employees for fourteen months. According to Gerhart's client, the County employees who held up the project made veiled comments that Gerhart was the reason for the delay.

[6]For example, Gerhart testified about the following exchange that occurred shortly after the County denied his permit application:

> Noel (a neighbor) was doing some site work for landscapers and one of the neighbors complained about rocks on the County's approach. And Larry Ehle came out, stood on Noel's brand new approach that he built and proceeded to tell him that maybe a couple of rocks needed to be moved. And, of course, afterwards I looked at Noel and I said, "Well, Noel, did you apply for a permit for this approach?" And Ehle was standing right there. You could see it's a brand new road. And he just laughed and said, "No."

Commissioners and Ehle all testified about their routine practice for responding to approach permit applications. The general practice is for Ehle to investigate the approach. If the approach has any problems, then Ehle typically works with the applicant to address them. After Ehle signs off on an application, he forwards it to the Commissioners. If two of the three Commissioners sign the permit, it is granted.

The Commissioners rarely disagree with Ehle's recommendation of how to handle a permit application. In fact, the testimony of the Commissioners and Ehle indicates that outright denial of an approach permit application is incredibly uncommon. Commissioner Hutchin could remember only three permit applications (including Gerhart's) that were denied in the 24 years that he was a Commissioner. Commissioner Whitson could not remember any permit applications other than Gerhart's that were denied while he was a Commissioner. Nor could Commissioner Trusler recall ever denying a permit after the permit was "given back to the road superintendent to work out some particular issues." Finally, Ehle has considered over one thousand permit applications, none of which have ever been denied.

## C.   Procedural History

On June 12, 2008, Gerhart received written notification that his permit application was denied. A few weeks later, Gerhart's attorney sent a letter to the County, complaining that other similarly situated property owners on Juniper Shores Lane had built approaches without obtaining permits. In response, the Commissioners sent a letter to Gerhart that for the first time elaborated their reasons for denying his permit. In particular, the Commissioners stated that the reasons for denying Gerhart's application were: (1) the fact that Gerhart had alternate driveway access to his property; and (2) the fact that adding an additional approach to Juniper Shores Lane was unsafe. Relatedly, the Commissioners alerted Gerhart that if his driveway crossed over the drainfield (which they indi-

cated it "may"), he must stop using the driveway and consult with the Lake County Environmental Health Department.

In January 2009, after the parties were unable to resolve the dispute, Gerhart filed this section 1983 case in federal district court, claiming that the County and the individual Commissioners violated his due process and equal protection rights. Defendants moved for summary judgment. In support of their summary judgment motion, the individual Commissioners argued that they were entitled to qualified immunity on Gerhart's due process claims and that Gerhart had not made out an equal protection violation.[7] The County argued that it was entitled to summary judgment because Gerhart had not alleged a County policy that resulted in a constitutional violation and therefore could not maintain a claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). After concluding that Gerhart could not establish a constitutional violation, the district court granted Defendants' motion for summary judgment on the federal claims and declined to exercise supplemental jurisdiction over Gerhart's state law claims, pursuant to 28 U.S.C. § 1367(c)(3). Gerhart timely appealed.

## II.   ANALYSIS

We review de novo the district court's grant of summary

---

[7]Summary judgment on the ground of qualified immunity for the individual Commissioners is appropriate if (1) viewing the evidence in the light most favorable to Gerhart, the Commissioners' conduct did not amount to a constitutional violation, or (2) in the alternative, Gerhart's constitutional rights were not "clearly established at the time of the violation." *Bull v. City and Cnty. of S.F.*, 595 F.3d 964, 971 (9th Cir. 2010) (en banc) (internal quotation marks omitted); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). Because the district court determined that Gerhart could not establish a constitutional violation, it ruled that the individual Commissioners were entitled to summary judgment under the first prong. As a result, the court did not address the second prong of the qualified immunity analysis.

judgment in favor of Defendants. *See Braswell v. Shoreline Fire Dep't*, 622 F.3d 1099, 1100 (9th Cir. 2010). Summary judgment for Defendants is appropriate if "there is no genuine issue of material fact and [Defendants are] entitled to judgment as a matter of law." *Orloff v. Cleland*, 708 F.2d 372, 375 (9th Cir. 1983).

## A.   Gerhart's Due Process Claims

[1] Gerhart alleges both procedural and substantive due process violations resulting from the denial of his permit application. To succeed on either claim, Gerhart must first demonstrate that he was deprived of a constitutionally protected property interest. *See Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008) (substantive due process); *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir. 1998) (procedural due process). We hold that Gerhart cannot make this threshold showing, and affirm the district court's grant of summary judgment to Defendants on Gerhart's due process claims.

[2]   In some instances, a person can have a constitutionally protected property interest in a government benefit, such as a license or permit. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *see also Groten v. California*, 251 F.3d 844, 850 (9th Cir. 2001) (holding that plaintiff had a protected property right to a temporary appraiser's license). To have a property interest in a government benefit, "a person clearly must have more than an abstract need or desire for [the benefit]. He must have more than a unilateral expectation of it. He must, instead have a legitimate claim of *entitlement* to it." *Roth*, 408 U.S. at 577 (emphasis added). Furthermore, a property interest must "stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

[3] Along the same lines, we have held that state law creates a "legitimate claim of entitlement" when it "imposes

significant limitations on the discretion of the decision maker." *Braswell*, 622 F.3d at 1102 (internal quotation marks and alterations omitted). For example, we have held that such an entitlement to a government permit exists when a state law or regulation requires that the permit be issued once certain requirements are satisfied. *See*, *e.g.*, *Groten*, 251 F.3d at 850 (holding that a protected property right to a license existed where both federal and state law entitled the applicant to a license whenever certain statutory requirements were met); *Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988) (holding that a builder had a property interest in a building permit where city regulations provided that once an applicant met certain requirements, a permit must be issued).

**[4]** Here, Montana law does not impose any limitations on the Commissioners' discretion to permit approaches to county roads. Instead, Montana Code Annotated section 7-14-2102 simply provides, "[e]ach board of county commissioners may in its discretion do whatever may be necessary for the best interest of the county roads and the road districts." Clearly, state law does not constrain the Commissioners' discretion to grant or deny approach permit applications.

**[5]** Our analysis does not end here, however, because Gerhart does not argue that his legitimate claim of entitlement to an approach permit is grounded in Montana law. Instead, Gerhart argues that the policies and practices of the County Commissioners have created such an entitlement. The Supreme Court has long recognized the existence of constitutionally protected property interests where a governmental body employs policies and practices that create a legitimate claim of entitlement to a government benefit. *See Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (holding that a protected property interest exists where there are "rules or mutually explicit understandings that support [a plaintiff's] claim of entitlement to the benefit"). For example, the plaintiff in *Perry*, a non-tenured junior faculty member at a state university, argued that he had a protected property interest in his job

in light of his employer's "*de facto* tenure program" for which he qualified. *Id.* at 600. The Court sided with Perry, writing, "[Perry] must be given an opportunity to prove the legitimacy of his claim of such entitlement in light of the policies and practices of the institution." *Id.* at 603 (internal quotation marks omitted). Similarly, in *Orloff*, 708 F.2d at 377, we held that "[d]espite the apparent expiration date of [the plaintiff's employment] contract, there may have arisen an understanding of continued employment based on prior treatment of [the plaintiff] or other . . . employees sufficient to constitute a *de facto* property interest."

**[6]** Gerhart argues that, like the professor in *Perry* and the plaintiff in *Orloff*, the Commissioners' policies and practices created a system for granting approach permits that endowed Gerhart with a claim of entitlement. We are not persuaded by this argument. Critically, unlike the professor in *Perry* and the plaintiff in *Orloff*, Gerhart did not have an ongoing or informal agreement with the County. Although Gerhart has sympathetically alleged that he *believed* his permit application was approved, he has not alleged a mutual understanding with the Commissioners. There is simply no evidence that the County ever entered into an agreement with Gerhart that he could construct an approach to Juniper Shores Lane. Despite Ehle's apparent approval of Gerhart's approach, there is no evidence that the Commissioners shared this view.

**[7]** A person's belief of entitlement to a government benefit, no matter how sincerely or reasonably held, does not create a property right if that belief is not mutually held by the government. The Supreme Court has explained, "[a] constitutional entitlement cannot be created—as if by estoppel—merely because a wholly and *expressly* discretionary state privilege has been granted generously in the past." *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981); *accord Leis v. Flynt*, 439 U.S. 438, 443 (1979) (concluding that no property right to appear *pro hac vice* in Ohio court existed because the plaintiff's counsel did not demonstrate "the requi-

site *mutual* understanding that they would be permitted to [appear *pro hac vice*].”). We have similarly held that a government body’s past practice of granting a government benefit is insufficient to establish a legal entitlement to the benefit. *See, e.g.*, *Cassidy v. Hawaii*, 915 F.2d 528, 531 (9th Cir. 1990) (rejecting the argument that because the government body “generally renews permits, . . . this custom created an understanding that would justify a legal entitlement”); *Punikaia v. Clark*, 720 F.2d 564, 570 (9th Cir. 1983) (holding that a state’s continuous operation of a nursing home was not the type of “custom” or “regularity of performance” that would create a legitimate entitlement (internal quotation marks omitted)). Similarly here, Gerhart’s claim of entitlement is grounded in the County’s past practice of leniently granting approach permits, without any evidence or allegation of a mutual understanding that he was otherwise entitled to a permit. Accordingly, we conclude that there is no genuine issue of material fact, and Gerhart does not have a protected property interest in an approach permit.

**[8]** Gerhart’s remaining arguments are unavailing. Gerhart argues that the Commissioners limited their own discretion by placing Ehle in charge of administering approach permits. Specifically, Gerhart claims that the Commissioners vested Ehle with the authority to approve permit applications, and that Ehle and Gerhart shared a mutual understanding that Gerhart’s application was approved. Crucially, though, neither Ehle nor the Commissioners testified at their depositions that Ehle had the authority to approve approach permit applications. On the contrary, all of the Commissioners and Ehle testified that the decision to approve or deny a permit application was left to the Commissioners’ discretion. Therefore, there is no record evidence that Ehle’s participation in the permitting process limited the Commissioners’ discretion or created a legitimate claim of entitlement for Gerhart. We therefore affirm the district court’s grant of summary judgment to Defendants on Gerhart’s due process claims.

## B.  Gerhart's Equal Protection Claim

**[9]** Gerhart also claims that in denying his approach permit application, the Commissioners violated the Equal Protection Clause of the Fourteenth Amendment.[8] The Equal Protection Clause guarantees, "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Gerhart's equal protection claim is a "class of one claim," which alleges that the Commissioners intentionally treated him differently from other similarly situated permit applicants. The Supreme Court has recognized that "an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called 'class of one.' " *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)).

**[10]** To succeed on his "class of one" claim, Gerhart must demonstrate that the Commissioners: (1) intentionally (2) treated Gerhart differently than other similarly situated property owners, (3) without a rational basis. *Willowbrook*, 528 U.S. at 564; *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008). Although Gerhart must show that the Commissioners' decision was intentional, he need not show that the Commissioners were motivated by subjective ill will. *Willowbrook*, 528 U.S. at 565 (rejecting the interpretation that a plaintiff must allege that the governmental action was the result of subjective ill will in a "class of one" claim).

---

[8]It appears that Gerhart's claim against the County was grounded on the Commissioners' alleged violation of Gerhart's due process rights. Because we have determined that Gerhart has not made out a violation of his due process rights, his claim against the County does not survive. To the extent that Gerhart's claim against the County derives from an equal protection violation, Gerhart has not offered any argument to support this theory so we consider it waived. *See Crawford v. Lungren*, 96 F.3d 380, 389 n.6 (9th Cir. 1996).

The district court erred in holding that no genuine issues of material fact existed and that Gerhart's "class of one" claim failed as a matter of law.

### 1.   *Unique Treatment*

**[11]** Gerhart presented considerable evidence that he was treated differently than other similarly situated property owners throughout the permit application process. Specifically, Gerhart's uncontradicted testimony was that at least ten other property owners on his block have built approaches to Juniper Shores Lane of which the Commissioners are aware, but for which the Commissioners have not required approach permits. This evidence strongly suggests that Gerhart was singled out when he was told to apply for an approach permit.

**[12]** The evidence also suggests that Gerhart was treated differently than other permit applicants after his application was submitted. The usual practice for dealing with concerns about an approach was for Ehle to work with the applicant to address the problem. With Gerhart's application, however, the Commissioners did not follow this usual procedure; instead Gerhart's application was put "on hold." The eventual denial of Gerhart's permit application was also an outlying occurrence, as described above.

### 2.   *Intentional Treatment by the Commissioners*

In the district court's view, the evidence unambiguously demonstrated that the Commissioners at worst *accidentally* discriminated against Gerhart in denying his approach permit application. In particular, the district court rejected the possibility that Gerhart's difficult history with the County and the complaints lodged against him by neighbors could have influenced the Commissioners' treatment of his application.

**[13]** This approach was erroneous. By looking for evidence of the Commissioners' personal animosity towards

Gerhart, the district court incorrectly analyzed Gerhart's "class of one" claim, which does not require a showing of the government officials' subjective bad feelings towards him. Gerhart does not need to demonstrate that the Commissioners harbored ill will towards him in order to meet the "intent" requirement of his "class of one" claim. *Willowbrook*, 528 U.S. at 565. Instead, Gerhart must show that the Commissioners intended to treat him differently from other applicants. Viewing this evidence in the light most favorable to Gerhart, as we must, we conclude there are triable issues of fact on this question.

**[14]** For one thing, a reasonable factfinder could find that the Commissioners were aware that their treatment of Gerhart's permit application was anomalous because all three Commissioners testified that their ordinary practice of handling permit applications rarely, if ever, included denying applications. Also relevant to the Commissioners' intent is evidence that Commissioner Trusler—the person who initially directed Ehle to put Gerhart's application on hold—spoke to one of the Gobles about Gerhart's approach. This evidence suggests that the Commissioners were aware of complaints against Gerhart and might have intentionally singled him out.

Additionally, Gerhart presented evidence that Murphy shared his negative views about Gerhart with Moser around the time that Moser directed Ehle to notify Gerhart that his permit application was denied. This evidence suggests that Murphy's past experiences with Gerhart might have influenced the denial of Gerhart's application.

**[15]** Finally, Gerhart alleged a continuous history of harassment by County employees from the planning and sanitation departments, which were headed by Commissioner Trusler for more than two decades before he became a Commissioner. In one instance, a sanitation conflict between Gerhart and Murphy escalated to the point that Commissioner Trusler became involved. In light of this previous dispute, a

factfinder could find that Trusler had a reason to single out Gerhart.

### 3. *Rational Basis*

**[16]** The district court also made a crucial error in its analysis of the rational basis requirement of Gerhart's "class of one" claim. Specifically, the district court analyzed whether there was a rational basis *for denying Gerhart's application*, when it should have analyzed whether there was a rational basis for *treating Gerhart differently*. *Willowbrook*, 528 U.S. at 564 (explaining that a class of one claim requires plaintiff to show that "there is no rational basis for the difference in treatment"). We have recognized that the rational basis prong of a "class of one" claim turns on whether there is a rational basis for the *distinction*, rather than the underlying government *action*.[9] For example, in *SeaRiver Maritime Financial Holdings, Inc. v. Mineta*, 309 F.3d 662 (9th Cir. 2002), we considered the constitutionality of a federal law that excluded a single oil tanker from the waters of Prince William Sound, Alaska. In rejecting the "class of one" claim brought by the owners and operator of the tanker, we held that it was reasonable for Congress to "single out" the tanker, which had previously spilled eleven million gallons of oil into the Sound. *Id.* at 680. We explained that it was "also rational for Congress to use this past disaster as a measure of future performance to *specifically bar* the [tanker] from transporting oil through [the Sound]." *Id.* (emphasis added). Thus, the rational basis prong of *Willowbrook* requires that we determine whether the Commissioners had a rational basis for singling out Gerhart.

---

[9]This principle applies in all Equal Protection claims in which there must be a rational basis for differential treatment. *See, e.g.*, *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 590 (9th Cir. 2008) ("Similar to [*Willowbrook*], the question here is not simply whether administrative costs were a rational reason for denying Lazy Y's bid [to lease certain land from the Idaho State Board of Land Commissioners] . . . . The real question is whether there is a rational basis for this *distinction*.") (emphasis added)).

We conclude that there is a genuine issue of material fact as to whether the Commissioners had a rational basis for treating Gerhart differently from similarly situated property owners. When the Commissioners eventually disclosed their reasons for denying Gerhart's application, they explicitly stated that the denial was based on an (unconfirmed) belief that Gerhart had alternate access to the property, and a safety concern that adding an additional approach to Juniper Shores Lane would create a safety risk.[10] Neither of these reasons is sufficient to affirm the grant of summary judgment in favor of the Commissioners.

[17] First, although the Commissioners stated in their denial letter that they believed Gerhart had alternate access to his property, Gerhart claims that this alternate access is not reliable. Gerhart also claims that other property owners on Juniper Shores Lane have constructed approaches to the lane despite having alternate access.

[18] Second, as to the Commissioners' safety concern, Gerhart testified that at least ten of his neighbors have approaches to Juniper Shores Lane. Even if the Commissioners might have rationally feared that too many approaches would hinder safety of the lane, it may not be rational to require Gerhart to bear this burden alone. *See Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1509 (9th Cir. 1990) ("Although the objective of preserving a habitat for [a certain species of butterfly] is rational, it may not be rational to single out [plaintiff's property] to provide it."). The district court thus erred in concluding that no genuine issues of material fact existed and that the individual Commissioners were entitled to summary judgment on Gerhart's equal protection claim.

---

[10]The denial letter also mentioned as a "related matter" the Commissioners' concern that Gerhart's driveway "may have been installed over the top of his existing septic system drainfield." Contrary to the district court's analysis, the possible drainfield problem was *not* given as a reason for denying Gerhart's application.

## C.  Qualified Immunity for the Individual Defendants

**[19]** Qualified immunity shields the individual Commissioners from liability "insofar as their conduct d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As we noted above, to determine whether the individual Commissioners are entitled to qualified immunity, we ask (1) whether the plaintiff has "ma[de] out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly established' at the time of defendant[s'] alleged misconduct." *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009) (citing *Saucier*, 533 U.S. at 201). We can consider the two questions in any order, and if we answer either question in the negative, the individual Commissioners are entitled to qualified immunity. *Id.* at 818.

Although there are genuine triable issues of fact as to the merits of Gerhart's equal protection claim, the above discussion demonstrates that he has alleged a constitutional violation. Therefore, we must consider whether Gerhart's equal protection right was clearly established at the time his permit application was rejected. We conclude that the right was clearly established, and conclude that the individual Commissioners are not entitled to summary judgment on the ground of qualified immunity.

A defendant is not liable for actions that "d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. A right can be clearly established in a novel factual situation, so long as the existing law gives the defendants "fair warning" that their actions are unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

**[20]** Gerhart's constitutional right not to be intentionally treated differently than other similarly situated property owners without a rational basis was clearly established at the time his permit application was denied. Gerhart's application was denied in June 2008, nearly eight years after the Supreme Court decided *Willowbrook*. Like Gerhart's case, *Willowbrook* involved a "class of one" claim by a property owner who complained that she was treated differently than other property owners in the conditions imposed by the municipality for access to a public resource. The facts of *Willowbrook* and this case are exceptionally similar. Because *Willowbrook* clearly establishes Gerhart's constitutional right to not be intentionally treated differently than other similarly situated property owners without a rational basis, we conclude that the individual Commissioners are not entitled to qualified immunity on Gerhart's equal protection claim.

## III.  CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment to the County. We also affirm the district court's grant of summary judgment to the individual Commissioners on Gerhart's due process claim. We reverse the district court's grant of summary judgment to the individual Commissioners on Gerhart's equal protection claim and remand that claim for trial.[11] Gerhart shall recover his costs on appeal.

**AFFIRMED IN PART AND REVERSED IN PART.**

---

[11]Because the district court dismissed all of Gerhart's federal claims, it declined to assert supplemental jurisdiction over his state law claims pursuant 28 U.S.C. § 1367(c)(3). In light of our disposition, we further order that Gerhart's state law claims be reinstated subject to further pretrial proceedings, as warranted.